UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-62106-CIV-COHN/SELTZER

CONSENT CASE

JUAREZ GABRIEL DASILVA,

        Plaintiff,

vs.

AL LAMBERTI, in his official capacity
as BROWARD COUNTY SHERIFF,
and DEPUTY SHERIFF SCOTT BURES,
individually,

        Defendants.

_____/

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

        THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment (DE

31). The Motion has been fully briefed and is ripe for decision. After carefully considering

the parties' written submissions, the record, and the applicable law and being otherwise

sufficiently advised, it is hereby ORDERED that the Motion is GRANTED in part and

DENIED in part for the reasons set forth below.

CLAIMS

        Plaintiff Juarez Gabriel DaSilva ("DaSilva") brings this action against Al Lamberti,

in his official capacity as Broward County Sheriff ("BSO"),[1] and against Deputy Sheriff

_____

      [1] A suit against an individual in his official capacity is treated as a suit against the
governmental entity he represents. Kentucky v. Graham, 473 U.S. 159, 166 (1985).
Accordingly, as Al Lamberti is sued only in his official capacity as Sheriff of Broward
County, the Court will refer to this defendant as "BSO" (Broward Sheriff's Office).

Scott Bures ("Bures"), in his individual capacity.   This action arises out of an incident in which a BSO police dog bit DaSilva.  The Complaint asserts federal constitutional claims under 42 U.S.C. § 1983 against BSO and Bures (Counts I and II) for an arrest without probable cause and for the use of excessive force in effectuating the arrest, in violation of the Fourth Amendment.   The Complaint additionally asserts state law claims for assault against BSO and Bures (Counts III and IV), for battery against BSO and Bures (Counts V and VI), and for false arrest against BSO and Bures (Counts VII and VIII).   Defendants have moved for summary judgment on all claims.

<u>STANDARD OF REVIEW</u>

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  An issue is "genuine" if a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).   A fact is "material" if it must be decided to resolve the substantive claim or defense to which the motion is directed.  <u>Id.</u>; <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993).

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  Once the movant has satisfied its initial burden, the non-moving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evidence showing the existence of genuine issues of material fact for trial.  Fed. R. Civ.

P. 56(e); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Adickes</u>, 398 U.S. at 160.

Summary judgment is appropriate when, after adequate time for discovery, the non-moving party cannot establish an essential element on which it bears the burden of proof. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  <u>Id.</u>; <u>accord</u> <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1080 (11th Cir. 1990).

In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the non-moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  Furthermore, facts asserted by the party opposing summary judgment must generally be regarded as true if supported by affidavit or other evidentiary material.  <u>Coke v. Gen. Adjustment Bureau, Inc.</u>, 640 F.2d 584, 595 (5th Cir. Mar. 1981) (quoting 10C Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727 at 524-30 (1973)).

## <u>FACTUAL BACKGROUND</u>

On August 27, 2007, at about 7:30 a.m., Deputy Bures and his K-9 partner, Bento, were dispatched to the scene of a crime in the Bonnie Loch neighborhood of Pompano Beach, Florida.  (Bures Dep., pp. 30, 39, 48-49).  Deputy Bures was informed while en route that a rape had been reported, that the suspect had fled on foot, and that a search for the suspect was underway. (Bures Dep., pp. 6, 55).  Bures also learned that the

suspect was a black male with close-cropped hair who was wearing only dark shorts. (Bures Dep., p. 6). Other BSO deputies maintained a perimeter around the neighborhood; Bures' responsibility was to respond to the suspect's location. (Bures Dep., pp. 55, 60, 111-112, 132-33). When Bures arrived at the Bonnie Loch subdivision, but before he had reached the rape scene, the aviation unit circling over the neighborhood advised Bures that an individual fitting the description of the suspect was in a backyard, but was moving toward the front of the house (Bures Dep., pp. 46-47, 53-54). With guidance from the aviation unit, Bures proceeded to that location. (Bures Dep., p. 139). He parked his marked BSO vehicle in the street and removed Bento, his K-9 partner. (Bures Dep., p. 40, 53-54, 57). Bento was on a six-foot leash (Bures Dep., p. 68).

According to Plaintiff DaSilva (a Brazilian whose native language is Portuguese),[2] he was talking on a cellphone while sitting on the enclosed front porch of his residence when Deputy Bures arrived. (DaSilva Dep., p. 18; DaSilva Decl., ¶ 7). DaSilva's residence is located one block from the rape scene (Bures Dep., p. 40). DaSilva was dressed only in dark shorts; he was not wearing a shirt or shoes. (DaSilva Dep., p. 14; Jeff Vomero Dep., p. 32).

Plaintiff DaSilva's and Deputy Bures' versions of what then transpired differ. According to DaSilva, Deputy Bures, with the leashed K-9, approached the porch and instructed DaSilva to come off the porch; DaSilva complied. (DaSilva Dep., p. 19; DaSilva Dec., ¶ 8; Bures Dep., p. 70). When DaSilva first saw Bento, the K-9 was stationary, and

---

[2]  DaSilva also speaks and understands basic Spanish and very limited English. (DaSilva Dep., p. 4-5; DaSilva Decl., ¶ 4).

not doing anything.  (Bures Dep., p.21).   The K-9 then started barking and jumping (DaSilva Dep. p. 21).   DaSilva walked toward Bures and the leashed K-9, stopping approximately five feet away.  (DaSilva Dep. p. 21).[3]  DaSilva avers that after stopping he stood perfectly still because he was "deathly afraid of the jumping, barking police dog." (DaSilva Decl., ¶ 10).   According to DaSilva, without any K-9 warning, Deputy Bures released the K-9's leash, and the dog bit DaSilva's penis. (DaSilva Dep., p. 21; DaSilva Decl., ¶ 9).  After being bitten, DaSilva fell to the ground and tried to shield himself from the attack; while DaSilva was on the ground, the dog bit DaSilva's arm multiple times. (DaSilva Dep., p. 21-22).  DaSilva estimates that the dog held on to his arm for about two minutes. (DaSilva Dep., p. 22).

According to Deputy Bures' version of events, when he arrived at the house, no other deputies were present. (Bures Dep., p. 51).  Bures found DaSilva standing on the porch, near the doorway; he observed that DaSilva matched the description of the suspect. (Bures Dep. pp. 56-57, 72, 85, 141-42).  Deputy Bures approached DaSilva with his K-9 until they were about ten feet away; he instructed DaSilva (in English) to step out from the porch; he acknowledges that Bures complied with this instruction. (Bures Dep., pp. 70, 72-73, 75, 118).  Deputy Bures testified that as he approached the porch, he gave a K-9 announcement[4] in English, which automatically alerts the K-9 that they are looking for a

---

[3]  DaSilva estimates that he walked approximately seven feet from the porch. (DaSilva Dep., p. 23).

[4]  Deputy Bures testified the canine announcement is "Broward Sheriff's Office. You're under arrest.  Surrender now or I will release the police dog."  (Bures Dep., p. 75). DaSilva denies that Deputy Bures gave a canine announcement.  (DaSilva Decl, ¶ 9).

suspect. (Bures Dep., p. 75). The K-9 then began barking and lunging against the leash, which is a normal reaction when the K-9 is working. (Bures Dep., pp. 74, 129).

After he had arrived at DaSilva's location, Deputy Bures heard the name of the suspect (Robert Pierre) over his radio (Bures Dep., p. 67-68). Deputy Bures asked DaSilva for his name and DaSilva responded, but with the helicopter overhead, the barking K-9, and DaSilva's accent, he could not understand the response. (Bures Dep., pp. 73-74, 85-86, 91, 116).

According to Deputy Bures, when DaSilva left the porch and continued to walk forward, Bures gave ground, backing toward the street, to give DaSilva room to lie on the ground; he retreated to the sidewalk and stopped. (Bures Dep., pp. 70-71, 76, 129). According to Deputy Bures, he instructed DaSilva to get on the ground, orally and using hand gestures (pointing to the ground).[5] (Bures Dep., pp. 78, 94-95, 115-116, 130). According to Bures' version of the events, DaSilva continued to walk toward him and the K-9 until he was close enough for the K-9 to reach out and make contact with DaSilva's shorts. (Bures Dep., pp. 78-79, 81-82, 142). Bures never instructed the K-9 to engage DaSilva (Bures Dep., pp. 78-79, 82). He believed that the K-9 had contacted only the fabric of DaSilva's shorts, and Bures continued to hold the K-9 back. (Bures Dep., pp. 78-79).

According to Deputy Bures, DaSilva then jumped back and swung at the K-9 (Bures Dep., pp. 79-80, 82-83, 141). Bures then released his hold on the K-9 and attempted to

---

[5] DaSilva denies that Bures ever ordered him to get on the ground, either orally or by pointing to the ground (DaSilva Decl., ¶ 11).

secure DaSilva.  (Bures Dep., pp. 83, 141).  The K-9 attached onto DaSilva's arm, and all three fell to the ground.  (Bures Dep., pp. 79-80).  During the struggle, Deputy Bures noticed another deputy, Jeff Vomero, at the scene; Deputy Vomero helped restrain DaSilva. (Bures Dep., p. 86).

Deputy Vomero testified that he observed Deputy Bures ordering DaSilva to lie on the ground, using both words and hand gestures.  (Vomero Dep., pp. 21-22, 37-38).  According to Vomero, DaSilva failed to follow Bures' commands to lie on the ground; instead, DaSilva kept walking toward the K-9.   At that time Bures had a "good grip of the leash" and "was pulling back."  (Vomero Dep., pp. 21-22, 30, 37-38).  After the K-9's initial contact with DaSilva, Vomero saw DaSilva strike the K-9.  (Vomero Dep., p. 60).   Once Deputy Bures had DaSilva under control, he placed DaSilva in handcuffs.  (Vomero Dep., 37-38, 39, 47).

Neither Deputy Bures nor Deputy Vomero observed DaSilva with any weapon.  And both deputies testified that before the K-9 attack DaSilva did not make any aggressive or physical intimidating gestures or try in any way to harm them.  (Bures Dep., pp. 76-77, 118; Vomero Dep., pp. 33-34).   Additionally, both deputies acknowledge that DaSilva did not attempt to flee. (Bures Dep., pp. 56, 72, 81; Vomero Dep., p. 32, 39-40).   Deputy Bures, however, believed that DaSilva's refusal to get on the ground was an indication that he might attempt to flee.  (Bures Dep., pp. 80-81, 84, 114).  And Deputy Vomero considered DaSilva a flight risk because as he continued to approach the K-9 he was moving into an area where flight was possible. (Vomero Dep., pp. 33-34).

After DaSilva was secured, other deputies asked DaSilva his name and whether he

had any identification.   These deputies also removed the handcuffs from DaSilva. (DaSilva Dep., p. 26).  The deputies then went inside DaSilva's residence and retrieved his passport to verify his identity. (DaSilva Dep., p. 26).  And after ascertaining that DaSilva was not the suspect, the deputies released DaSilva (Vomero Dep., p. 48). DaSilva was not charged with any offense. (Bures Dep., p. 156).  Paramedics transported DaSilva to the hospital where he was treated for injuries to his genitals and arm.  (DaSilva Dep., 29-31).

I.     FEDERAL CONSTITUTIONAL CLAIMS AGAINST DEPUTY BURES

DaSilva alleges that Deputy Bures unlawfully arrested him without probable cause and that he used excessive force in effectuating the arrest, in violation of the Fourth Amendment (Count II).  Deputy Bures moves for summary judgment based on the doctrine of qualified immunity.  The Court will address DaSilva's probable cause claim and his excessive force claim separately.

A.     Qualified Immunity Principles

Qualified Immunity "protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established rights of which a reasonable person would have known.'"  Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The purpose of this immunity is to allow governmental officials to carry out their discretionary duties without fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citations and quotations omitted); see also Hardin v.

8

Hayes, 957 F.2d 845, 849 n.7 (11th Cir. 1992) ("The doctrine balances society's interest in providing a remedy for injured victims and discouraging unlawful conduct with that of enabling public officials to act independently and without fear of consequences.").

The Eleventh Circuit recently reiterated the oft-repeated requirements for qualified immunity:

> To receive qualified immunity, the officer must first show that he acted within his discretionary authority. . . . Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply.[6] In analyzing the applicability of qualified immunity, the Court has at its disposal a two-step process. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Traditionally, a court first determines whether the officer's conduct amounted to a constitutional violation. Id. Second, the court analyzes whether the right violated was 'clearly established' at the time of the violation." Id. . . . Thus, if the violated right was not clearly established, qualified immunity still applies.

Lewis, 561 F.3d at 1291.  Under Saucier, a court was required to analyze these two requirements in strict sequential order.  The Supreme Court, however, recently held that lower courts have the discretion to decide which of the two prongs to consider first. Pearson v. Callahan, ___ U.S. ___, ___, 129 S. Ct. 808, 818 (2009).  This Court will analyze the constitutional issue first and then, if necessary, address whether the law was clearly established.

---

[6] It is clear from the record (and undisputed by the parties) that Deputy Bures was acting within his discretionary authority.  Accordingly, the burden shifts to DaSilva to show that Deputy Bures is not entitled to qualified immunity.

B.     Probable Cause Claim

DaSilva first contends that he was arrested without probable cause.[7]  Deputy Bures

argues that he is entitled to qualified immunity on the probable cause claim.

1.     Constitutional Right

Under the Fourth Amendment, an individual has the right to be free from arrest

unless the arrest is justified by probable cause.  Durruthy v. Pastor, 351 F.3d 1080, 1089

---

[7]  "For purposes of Fourth Amendment analysis, there are 'three broad categories of police-citizen encounters': '(1) police citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full scale arrests.'"  Wright v. Burkhead, No. 6:07-cv-2039-Orl-19KRS, 2009 WL 1393507, at *6 (M.D. Fla. May 18, 2009) (quoting United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006)).  The Eleventh Circuit has explained:

> The first category of consensual encounters does not implicate fourth amendment scrutiny. The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave.  In order to justify such a fourth amendment "seizure," the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required.

U.S. v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir.1986) (internal citations omitted).

In both his Complaint and his summary judgment filings, DaSilva argues that Deputy Bures arrested him, although he has never identified the charge for which he was arrested. In connection with the state claim of false arrest, Deputy Bures contends that no arrest occurred; rather, DaSilva was merely detained because he matched the description of a fleeing rape suspect.  Whether DaSilva was "arrested" or was merely "detained," it is clear that a seizure occurred within the meaning of the Fourth Amendment.  See Terry v. Ohio, 392 U.S. 1, 19 n.16  (1988) (a "seizure" occurs when a police officer has restrained the liberty of a citizen by means of physical force or show of authority).

(11th Cir. 2003); Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998). "Probable cause for an arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009) (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir.1992)); see also McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (probable cause exists when an arrest is "objectively reasonable based on the totality of circumstances"); Lee, 284 F.3d at 1195 (probable cause exists "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.").

Even where a law enforcement officer lacked probable cause to make an arrest, the officer may still be entitled to qualified immunity if he had "arguable probable cause" to make the arrest. See Eslinger, 555 F.3d at 1327 ("If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed."); Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) ("Qualified immunity applies when there was arguable probable cause for an arrest even if actual probable cause did not exist."). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest.'" Eslinger, 555 F.3d at 1327 (quoting Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir.2001)); see also Durruthy, 351 F.3d at 1089 ("Arguable probable cause exists when an officer

11

reasonably could have believed that probable cause existed, in light of the information the officer possessed.") (internal marks and citation omitted).

_____ At the time of Deputy Bures' encounter with DaSilva, Deputy Bures knew that a rape had occurred, that the suspect had fled on foot, and that the suspect had been described as a black male wearing only dark shorts.  He additionally had been informed that the aviation unit had located an individual meeting the description of the rape suspect in the vicinity of the crime scene.  The aviation unit, hovering overhead, directed Deputy Bures to that location.  Once he arrived, Deputy Bures observed a black male, wearing only shorts.[8]   A reasonable officer possessing the same knowledge and in the same circumstances as Bures could have believed that probable cause existed to arrest DaSilva.  The Court, therefore, finds that Deputy Bures had at least arguable probable cause to arrest DaSilva.

_____

[8] In opposing summary judgment, DaSilva contends that its undisputed that Deputy Bures arrested him solely because he appeared to be a black male and that the color of his skin alone does not provide probable cause or arguable probable cause to arrest.  In support of this contention, DaSilva relies on the deposition testimony of Deputy Bures and Robert Thompson, a paramedic assigned to ride in the BSO helicopter that directed Bures to DaSilva's location.  After reviewing the testimony of both Bures and Thompson, the Court cannot conclude that DaSilva was arrested solely because he was black.   Although both Bures and Thompson acknowledged that they were looking for a black male, they consistently testified that DaSilva was in the vicinity of the crime scene and that he matched the description of the rape suspect, including that he was wearing only dark shorts.  For example, when asked "[w]hat it was about Mr. DaSilva that made you believe he may have been the rape suspect, Thompson responded:  "The only thing I pointed out was we had a subject who matched the description.  Male, I think he was mid 20's to 30's, medium build, wearing dark shorts.  And he was standing in his backyard with no shirt on in a pair of dark shorts . . . ."  Thompson Dep. at 44. And when DaSilva's attorney inquired whether Bures "believed that Mr. DaSilva was the rape suspect because he was a black male," Bures responded:  "He matched the description, He was in the area where the suspect had fled, so yes, I had reason to believe he was the suspect."  Bures Dep., p. 85.

Having found that arguable probable cause for DaSilva's arrest (or detention) existed, the Court need not address whether the constitutional right at issue was clearly established.  See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  Because no constitution violation occurred, Deputy Bures is entitled to qualified immunity on DaSilva's probable cause claim.

C.    Excessive Force Claim

DaSilva next contends that Deputy Bures violated his Fourth Amendment rights by using excessive force during the course of an arrest.  To establish an excessive force violation of the Fourth Amendment, DaSilva must demonstrate that a seizure occurred and the force used to effect the seizure was unreasonable.  Troupe v. Sarasota County, Florida, 419 F.3d 1160, 1166 (11th Cir. 1965).  Defendant Bures argues that he is entitled to summary judgment on DaSilva's Fourth Amendment claim because the use of force in this case was justified; in other words, no constitutional violation occurred.  He additionally argues that even if the force used was excessive, the law was not clearly established.

1.    Constitutional Right

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of arrest."  Lee, 284 F.3d at 1197.  Claims of excessive force are evaluated under the Fourth Amendment's objective reasonableness standard.  Graham v. Conner, 490 U.S. 386, 395 (1989).  A court, therefore, must consider whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to the

officers' underlying intent or motivation.  Lee, 284 F.3d at 1198 n.7.  Whether the amount of force used by a police officer was proper turns on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Id. at 1197. Accordingly, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396).  And the court must be mindful that "police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The Supreme Court has held that a determination of whether a police officer used reasonable force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests at stake." Graham, 490 U.S. at 396 (internal quotations omitted).  Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. But "[t]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198 (setting forth the Graham factors).  "In addressing these three factors, the Court should consider the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted." Pace v. City of Palmetto,

489 F. Supp. 2d 1325, 1331 (M.D. Fla. 2007) (citing <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002)).

　　　Taking the facts in the light most favorable to DaSilva, as the Court must do at this time, the relevant inquiry is whether it was reasonable for Deputy Bures to simply unleash the K-9, without any warning, when DaSilva had complied with Bures' commands, when he did not appear to have any weapons, when he was not threatening Bures and when he made no effort to flee.  The first <u>Graham</u> factor –  the severity of the crime – weighs in Deputy Bures' favor.  It was reasonable for Deputy Bures to believe that DaSilva may have committed the serious crime of rape.  At the time he encountered DaSilva – one block from the crime scene – he had been advised that the rapist was a black male, wearing only dark shorts.  And the aviation unit had advised Bures that a subject matching the description of the suspect had been located; he was in a backyard, but moving toward the front of the house.  The aviation unit then directed Bures to that location, where he observed DaSilva, a black male wearing only shorts, sitting on a front porch.

　　　However, viewing the facts in the light most favorable to DaSilva, the remaining <u>Graham</u> factors – the danger to the officer and the risk of flight – weigh in DaSilva's favor. DaSilva has proffered his own deposition testimony and a Declaration in which he avers that after complying with Deputy Bures' instruction to leave the porch, he walked toward Bures, and then stopped (about five feet from the dog); DaSilva then stood perfectly still because he was afraid of the barking, jumping police dog.  According to DaSilva, Bures then released the K-9's leash and the K-9 attacked him, biting his penis.  While DaSilva was on the ground, the dog then repeatedly bit his arm.  The K-9 attack lasted two

15

minutes, causing DaSilva serious injury.  DaSilva unequivocally denies that Bures ever

gave a K-9 warning or that Bures ever instructed him to lie on the ground, either orally or

by hand gestures.

If it were to credited DaSilva, a reasonable jury could find that he was subjected to

excessive force.  Under DaSilva's version of the facts, a constitutional violation occurred;

however, Deputy Bures may still be entitled to qualified immunity if the law was not clearly

established.  Saucier, 533 U.S. at 201 (stating that it if a constitutional right would have

been violated under the plaintiff's version of the facts, the court must then determine

whether the right was clearly established).

### 2.   Clearly Established Law

The second prong of the qualified immunity analysis is whether DaSilva's right to

be free from the use of excessive force was clearly established at the time of the subject

incident.  In determining whether a right is clearly established, the relevant inquiry is

"whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted."  Id. at 202.  For qualified immunity purposes, a right may be

clearly established in three ways: "(1) case law with indistinguishable facts clearly

establishes the constitutional right;[9]  (2) a broad statement of principle within the

---

[9]  See Long v. Staton, 508 F.3d 576, 584 (11th Cir. 2007).  In the Eleventh Circuit, the law may be "clearly established" only by opinions from the United States Supreme Court, the Eleventh Circuit, or the highest court of the state in whose law is at issue (here, Florida). Jenkins by McKenzie v. Talladega Bd. of Education, 115 F.3d 821, 827 n.4 (11th Cir. 1997) (en banc); Hamiliton v. Cannon, 80 F.3d 1525, 1531 n.7 (11th Cir. 1996). "[B]ecause excessive force cases are so fact sensitive, there will almost never be a previously published opinion involving exactly the same circumstances."  Trujillo v. City of Lakewood, Colorado, No. 08-cv-00149-WDM-CBS, 2009 WL 3260724, at *3 (D. Colo. Oct. 9, 2009) (considering excessive force claim arising out of a police dog bite).

Constitution, statute, or case law that clearly establishes a constitutional right;[10] or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."[11]   Lewis, 561 F.3d at 1291-92 (internal citations omitted and footnotes added).

DaSilva relies on the third method of demonstrating that the law was clearly established – that the officer's conduct was so egregious that a constitutional right was clearly violated.  He argues that Bures' "'conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [Defendant Bures], notwithstanding the lack of case law.'"  Memorandum in Opposition at 6-7 (quoting Priester v. City of Riviera Beach, Florida, 208 F.3d 919, 926 (11th Cir. 2000)).

To establish that the law was clearly established without resort to particularized case law or broad principles,  a "plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point." Lewis, 561 F.3d at 1292 (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (1997)).  "This standard is met when every reasonable officer would conclude that the excessive force used was plainly unlawful." Id. (citing Priester, 208 F.3d at 926-27).

The Court recognizes that the exception to the particularized case law requirement is narrow.  When viewing the facts in the light most favorable to DaSilva, however, the

---

[10]  See Long, 508 F.3d at 584.

[11]  See Mercado v. City of Orlando, 404 F.3d 1152, 1159 (11th Cir. 2005).

Court finds that every reasonable officer would conclude that employing a K-9, without any warning, against an individual who was standing completely still, who had complied with the officer's commands, who had not attempted to flee, who had no weapons, and who appeared to be no threat to the officer or others, constituted excessive force and was unlawful, even in the absence of particularized, pre-existing case law. See Lee, 284 F.3d at 1199 (denying qualified immunity without particularized precedent in excessive force case where officer slammed arrestee's head on car trunk after "she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed"); Priester, 208 F.3d at 926 -927 (finding no particularized case law was necessary where a police officer ordered and permitted his K-9 to attack and bite the plaintiff for two minutes and threatened to kill the plaintiff when he kicked the dog resisting the unprovoked attack; the suspect had immediately submitted to the police, obeyed command to lie on the ground, did not pose a threat of harm to the officers or others, had not attempted to flee or resist arrest); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir.2000) (denying qualified immunity without particularized precedent to officers who slammed arrestee's head into pavement, even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way); Smith v. Mattox, 127 F.3d 1416, 1419-20 (11th Cir.1997) (concluding officer's conduct was "far beyond the hazy border" and unlawfulness was "readily apparent even without clarifying caselaw" when officer, while on plaintiff's back and handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures even though plaintiff at the time was offering no resistance at all).

Even though the Court has found that Deputy Bures is not entitled to qualified

immunity on DaSilva's excessive force claim at the summary judgment stage, he is not precluded from pursuing the qualified immunity defense at the trial.  See Vaughan v. Cox, 343 F.3d 1323, 1333 (11th Cir. 2003).  Should the jury choose to reject DaSilva's version of the facts, or the facts not be presented at trial as alleged on summary judgment, the qualified immunity analysis may change.  Accordingly, Deputy Bures may choose to offer special interrogatories to the jury to resolve factual disputes going to the qualified immunity defense.

II.    FEDERAL CONSTITUTIONAL CLAIMS AGAINST BROWARD SHERIFF'S OFFICE

A municipality, county, or other governmental entity may be subjected to liability for constitutional deprivations under § 1983; a governmental entity, however, may not be held liable for the actions of its employees on a theory of *respondeat superior*, that is, solely because it employed a tort-feasor.  Monell v. Dept. of Social Services, 436 U.S. 658, 694 (1978); Grech v. Clayton County, 335 F.3d 1336, 1329 (11th Cir. 2003) ("A county's liability under § 1983 may not be based on the doctrine of respondeat superior.").  To recover against a governmental entity, a plaintiff must instead demonstrate that the governmental entity had an official policy or custom[12] that was "the moving force of the constitutional violation."  Polk County v. Dodson, 454 U.S. 312, 326 (quoting Monell, 436 U.S. at 694); see also Grech, 335 F.3d at 1329; Vineyard v. County of Murray, 990 F.2d 1207, 1211 (11th Cir.1993); Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th

---

[12] "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law."  Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (internal citations omitted).

Cir. 1991).    The Supreme Court has spoken to a municipality's failure to adequately train its police officers, making clear that such a failure may give rise to municipal liability; however, the Court has set the standard high: "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to <u>deliberate indifference</u> to the rights of persons with whom the police come into contact."   <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989) (emphasis added).    The <u>Canton</u> Court explained:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

<u>Id.</u> at 390.    Further, the <u>Canton</u> Court made clear that to establish a failure to train, a plaintiff must identify a particular deficiency in the training program and then establish that the identified deficiency was the actual cause of the alleged constitutional injury.   <u>Id.</u> at 391.  The Court stated that the proper inquiry should be: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"   <u>Id.</u> at 391.  A plaintiff, therefore, cannot satisfy his burden merely by establishing that a particular officer was inadequately trained, or that there was negligent administration of an otherwise adequate program, or even that the conduct resulting in injury could have been avoided by more or better training.   <u>Id.</u>  Rather, "a plaintiff must present some evidence that the municipality knew of a need to train . . . in a particular area

and the municipality made a deliberate choice not to take any action." Lewis, 561 F.3d at 1293 (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).

The Eleventh Circuit has explained that a municipality may be put on notice of a need to train in two ways:

> First, if the city is aware that a pattern of constitutional violation exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent. Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violations is so high that the need for training would be obvious.

Id. One court in this district recently characterized the two instances in which a failure to train argument can succeed: (1) "when 'city policy-makers know to a moral certainty' that their employees will encounter a certain situation such that the need to train officers is 'so obvious that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights'"; and (2) "when city employees 'in exercising their discretion, so often violate constitutional rights that the need for further training [is] plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.'" Unuvar v. City of Key West, No. 08-10109-CV, 2009 WL 2915783, at *4 (S.D. Fla. Sept. 11, 2009) (King, J.) (quoting Canton, 489 U.S. at 390 n.10).

In his Complaint, DaSilva alleges generally that BSO "as a matter of policy, practice or custom has with deliberate indifference failed to adequately train or otherwise direct the K-9 police officers and their K-9's concerning the rights of citizens. . . ." Complaint, ¶ 36. More specifically, he additionally alleges that BSO "failed to properly train its officers as to when and how to employ the use of police dogs, which resulted in the attack and arrest

at issue here."  Complaint, ¶ 37. In response to the summary judgment motion, however, DaSilva appears to limit his federal constitutional claim (with respect to canine use) against BSO to a failure to train its police officers to give a canine warning and to give such warning in the language of the community in which the police dog is deployed.

BSO moves for summary judgment on the ground that it had no policy or custom, official or otherwise, that caused DaSilva's injury, and, therefore, DaSilva cannot show that it acted (or failed to act) with deliberate indifference.

DaSilva has not presented any evidence of prior incidents to establish a pattern of constitutional violations. To demonstrate deliberate indifference, therefore, he must demonstrate that BSO knew that "the likelihood for constitutional violations is so high" that the need to train its officers to give a canine warning and to give it in English was obvious.

DaSilva first contends that a genuine issue of material fact exists as to whether Deputy Bures gave any canine warning at all.  And he contends that even if it is established that Bures gave such a warning, it is undisputed that he gave the warning only in English, even though he knew that Spanish, Creole, and Portuguese (as well as English) are all spoken in Pompano Beach (Bures Dep., pp. 66-67).[13]  In support, DaSilva relies on Bures' deposition testimony in which he acknowledged that he attempted to communicate with DaSilva only in English. (Bures Dep., pp. 70, 74).  Bures additionally testified that he gave the canine warning in English and that he does not know how to give the warning in any other language.  (Bures Dep., pp. 75, 124).  When asked whether

---

[13]  Deputy Bures testified that the demographics of the Bonnie Loch community in which the subject incident took place is mixed; it consists primarily of Caucasians, African-Americans, and Haitians.  (Bures Dep., p. 74).

BSO's policy is to give the warning only in English, Deputy Bures testified: "Well, you could only give it in the language you speak so – I don't know if it specifically addresses giving it in any other language, but I'm not taught in any other language." (Bures Dep., pp. 123-124). And when DaSilva's counsel asked, "And BSO doesn't teach you to say that phrase, the canine warning, in any other languages, correct?," Bures responded "Correct." (Bures Dep., p. 124).

Even assuming that Bures' testimony establishes that BSO does not have a program to train its officers to give the canine warning in languages other than English, to prevail on a failure to train claim, DaSilva "cannot simply show that there was no training program; he must show a *need* for training first." Unuvar, 2009 WL 2915783, at *4. DaSilva argues that "BSO's own documents evidence its knowledge of the need to train its deputies to (a) provide a K-9 warning announcement and (b) to give the warning in the language of the community." Memorandum in Opposition, at 8 (DE 37). In support, DaSilva proffers only a one-page excerpt of a March 1995 (updated January 2008) document entitled "Patrol Canine Legal Update and Opinions" written by a retired canine handler in Nevada.[14] Ex. I (DE 38). Under a section providing for canine deployment warnings (given to afford an opportunity for peaceful surrender before use of the dog), the document states, *inter alia*, that such warnings must be "in the language of the community you are deploying in." The Court does not find that this document alone establishes a need for training BSO officers in languages other than English nor that it establishes a

---

[14] DaSilva represents that BSO provided this document to him in response to his request for production of documents relating to BSO's policies and procedures concerning police dogs. Defendants do not dispute this representation.

"likelihood for constitutional violations [ ] so high that the need for training would be obvious." See Lewis, 561 F.3d at 1293.

Moreover, in addition to a need for such training, to establish "deliberate indifference" DaSilva must also demonstrate that BSO made a deliberate choice not to give the training. See Gold, 151 F.3d at 1350 ("a plaintiff must present some evidence that the municipality knew of a need to train . . . in a particular area and the municipality made a deliberate choice not to take any action") (emphasis added). DaSilva has not proffered any evidence demonstrating that BSO made a deliberate choice not to train its police officers to give a canine warning and/or to give it in languages other than English.

In sum, the evidence DaSilva has submitted to demonstrate BSO's constitutional violation for failing to adequately train its police officers in giving canine warnings "falls far short of [establishing] the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of [BSO], Canton, 489 U.S. at 396-397,[15] or that BSO deliberately chose not to train its officers in giving a canine warning, in English or otherwise.

_____

[15] DaSilva additionally appears to argue that BSO failed to train its officers that an arrest based solely on skin color is unlawful. He summarily argues that the need for training in this area is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of [BSO] can reasonably be said to have been deliberately indifferent to the need." Response at 9-10 (quoting Canton, 489 U.S. at 390). This argument, however, is without merit. The Court first notes that Count I of the Complaint asserting constitutional violations by BSO does not allege a failure to train with respect to arrests based on skin color. Moreover, DaSilva has not made any showing that BSO has, in fact, failed to train its officers with respect to race or there was a need for such training.

III.    STATE LAW CLAIMS AGAINST DEPUTY BURES

DaSilva has asserted state law claims for assault (Count IV), battery (Count VI), and false arrest (Count VIII) against Deputy Bures. Bures moves for summary judgment on all state claims on the ground that he is statutorily immune from liability. And, alternatively, Deputy Bures moves for summary judgment on the false arrest claim on the ground that he had probable cause to arrest (or detain) DaSilva.

Under Florida Statute § 768.28(9),[16] a police officer may not be held personally liable for any injury resulting from an act committed in the scope of his or her employment unless the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a); see also Prieto v. Malgor, 361 F.3d 1313, 1316 (11th Cir. 2004).

DaSilva argues that Deputy Bures is not entitled to immunity because he acted in a manner exhibiting wanton and willful disregard of DaSilva's rights and safety. Although the circumstances surrounding the dog bite are disputed, in deciding a summary judgment motion, the Court must view the facts in the light most favorable to the non-movant, DaSilva. According to DaSilva, he complied with Bures' orders and was standing perfectly

---

[16]  Florida Statute 768.28(9)(a) provides in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

still when, without any warning, Bures unleashed the dog, resulting in DaSilva's injuries. A reasonable jury could find from DaSilva's version of the events that Bures acted in bad faith, maliciously, or with wanton and willful disregard of DaSilva's rights and safety. Accordingly, summary judgment is not warranted on the state law claims against Bures on the ground that he is statutorily immune.

With respect to the false arrest claim, Deputy Bures alternatively argues that he is entitled to summary judgment because he had probable cause to arrest (or detain) DaSilva. Under Florida law, probable cause is an affirmative defense to a false arrest claim. Mailly v. Jenne, 867 So. 2d 1250, 1251 (Fla. 4th DCA 2004). For the reasons discussed above, the Court finds that Deputy Bures did have probable cause to detain and/or arrest DaSilva. Accordingly, Deputy Bures is entitled to summary judgment on DaSilva's false arrest claim.

IV.    STATE LAW CLAIMS AGAINST BROWARD SHERIFF'S OFFICE

DaSilva has asserted state law claims for assault (Count III), battery (Count V), and false arrest (Count VII) against BSO. BSO moves for summary judgment on all state claims on the ground that it is immune from suit to the extent that Bures' actions are considered willful and wanton.

Under the doctrine of sovereign immunity, a state (and its agencies or political subdivisions thereof) is immune from suit except where the state has consented to be sued. Florida, by enacting Florida Statute § 768.28, has given its consent to be sued in

tort actions, but only to the extent specified in the statute.[17]   Florida Statute § 768.28(9)(a)[18] provides that the exclusive remedy for injuries suffered as a result of any act or omission of its officers, employees, or agents is against the governmental entity or its head in his or her official capacity, "unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Fla. Stat. § 768.28(9)(a).  Thus, in this case, either the Broward Sheriff's Office or Deputy Bures may be held liable for DaSilva's state law claims, but not both.  See McGhee v. Volusia County, 679 So. 2d 729, 733 (Fla. 1996) ("[T]he

---

[17]  The Florida Supreme Court has held that "a sheriff is a 'county official,' and, as such, is an integral part of the 'county' as a 'political subdivision' and that section 768.28 is applicable to sheriffs as a separate entity or agency of a political subdivision."  Beard v. Hambrick, 396 So.2d 708, 711 (Fla. 1981).

[18]  Florida Statute 768.28(9)(a) provides in pertinent part:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).

27

Case 0:08-cv-62106-BSS   Document 45   Entered on FLSD Docket 12/22/2009   Page 28 of 29

intent behind [Florida Statute 768.28] was to extend the veil of sovereign immunity to the specified governmental employees when they are acting within the scope of employment, with the employing agency alone remaining liable. . . .  In any given situation either the agency can be held liable under Florida law, or the employee, but not both.").

BSO argues that it is immune from liability, but only <u>to the extent that Deputy Bures' actions are considered willful and wanton</u>.  Although this is correct, at this summary judgment stage of the litigation, the Court cannot find that BSO is immune from liability on the state claims.  If the jury credits DaSilva's version of events, it could very well find that Deputy Bures acted in bad faith, maliciously, or with wanton and willful disregard of DaSilva's rights and safety.  In such case, under § 768.28(9)(a), BSO would be immune; it could not be held liable for Bures' acts.  However, if a jury credits Deputy Bures' version of events, it could reasonably find that he did not act in bad faith, maliciously, or with wanton and willful disregard of DaSilva's rights and safety.   Accordingly, BSO then would not be immune from liability on the state claims.  In short, genuine issues of material fact exist as to the acts of Deputy Bures surrounding the K-9 attack on DaSilva, precluding summary judgment on the basis of immunity.

However, because the Court has found that Deputy Bures did not falsely arrest DaSilva – at least arguable probable cause existed for the arrest – the Court finds that summary judgment on the false arrest claim against BSO is warranted.

<u>CONCLUSION</u>

For the reasons stated above, it is hereby ORDERED that Defendants' Motion for Summary Judgment (DE 31) is GRANTED in part and DENIED in part.  More specifically,

28

it is ORDERED as follows:

1.     Insofar as the Motion seeks summary judgment for BSO and against DaSilva on the federal constitutional claim for failure to train against BSO (Count I), the Motion is GRANTED;

2.     Insofar as the Motion seeks summary judgment for Deputy Bures and against DaSilva on the Fourth Amendment claim that Deputy Bures lacked probable cause to arrest DaSilva (Count II), the Motion is GRANTED;

3.     Insofar as the Motion seeks summary judgment for BSO and Deputy Bures and against DaSilva on the state law claims for false arrest (Counts VII and VIII, respectively), the Motion is GRANTED; and

4.     The Motion is DENIED in all other respects.

DONE AND ORDERED in Fort Lauderdale, Florida, this 22nd day of December 2009.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

All counsel of record

29